IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 8, 2004

## IN RE: W.B. IV

**Appeal from the Juvenile Court for Williamson County**
**No. 41460     Al Nations, Judge**

_____

**No. M2004-00999-COA-R3-PT - Filed April 29, 2005**

_____


## IN RE: D.D., M.H., W.B. IV

**Appeal from the Juvenile Court for Williamson County**
**No. 27880     Al Nations, Judge**

_____

**No. M2004-01572-COA-R3-PT - Filed April 29, 2005**

_____

In a single proceeding, the juvenile court terminated the parental rights of a mother to her three children and the parental rights of the father of one of those children, ruling that they had abandoned the children. The mother and the father filed separate appeals, which we have consolidated for decision. We reverse because the proof at trial did not rise to the level required to establish abandonment as defined by applicable statutes.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, Jr, J.., joined.

Judy A. Oxford, Franklin, Tennessee, for the appellant, V.H.

Sharon E. Guffee, Franklin, Tennessee, for the appellant, W.B. III.

C. Diane Crosier, Franklin, Tennessee, for the appellees, L. B. and K. B.

**OPINION**

**I.**

V.H. ("Mother") was the mother of two young children, a girl, D.D., (born 8/4/95) and a boy, M.H. (born 10/24/97).[1] On June 20, 2000, she gave birth to another boy. The child was named after his father. In this opinion we will refer to the child as W.B. IV and to his father, W.B. III, as Father. Mother had a long-term addiction to crack cocaine and feared that her children would be taken away from her. As a result, she was unwilling to turn to the Department of Children's Services for assistance.

Dr. Susan Campbell, a doctor at the medical center where W.B. IV was born, was sympathetic to Mother's concerns and introduced her to Diann Mustin, a founder and member of Kadesh Barnea Ministries, Incorporated. Ms. Mustin described the organization as "people who were wanting to keep families together and help young mothers so they wouldn't get caught up in the system."

Prior to and for some time after the birth of W.B. IV, Mother and her children lived in an apartment in Hermitage with Father. He had a job and furnished the apartment and other support for all of Mother's children. After they got involved, Ms. Mustin and her friends in the organization had frequent contact with Mother and attempted to assist her. They would sometimes bring the children to their homes to give Mother a break. During the group's early involvement with Mother and her family, one of Ms. Mustin's friends, Bobbie Gongwer,[2] took "primary responsibility" for them.

Mother knew that in order to keep her children and take care of them, she needed to go into a drug rehabilitation program. Ms. Mustin, Ms. Gongwer, and their friends agreed to help her. Mother enrolled in a program, but apparently did not complete it. After three months in the rehabilitation program, Mother lost her apartment. Ms. Mustin and her friends then arranged for Mother and children to stay at a house in Franklin owned by Kadesh Barnea. The children frequently stayed with Ms. Gongwer on the weekends. Sometime in 2001, Mother decided she wanted to try to make it on her own and moved to an apartment in Nashville.

Whether it was the first place she moved or not, which is not clear in the record, Mother got an apartment, probably in the summer of 2001, at the J.C. Napier Homes, a public housing project in Nashville. Father testified that he provided furniture for that apartment, since Mother had none, and provided other support for the family. Although the evidence is not entirely clear on this point, according to Mother's sister, Father lived with Mother and the children at Napier Homes for some

---

[1] Mother also had an older boy, who was in the custody of his father. Father, W.B. III, was not the father of either of the two other children who are the subject of the petition herein, D.D. and M.H., and they each had different fathers. This appeal involves only Mother and the father of the youngest child.

[2] The transcript of Ms. Mustin's testimony identifies this person as Bobbie Songworth. However, a document introduced into evidence shows her last name as Gongwer.

part of this time, continuing to provide support. He subsequently moved to his mother's house, but continued to see Mother and the children regularly.

In September of 2001, Ms. Gongwer moved to California. By January and February of 2002, Ms. Gongwer was repeatedly asking Ms. Mustin to locate and check on the children. At first, Ms. Mustin was reluctant to do so, but, in April of 2002, she found Mother and the children at the Napier Homes apartment. Because of the condition of and environment in the apartment, Ms. Mustin took the three children to her home, without objection from Mother.

At Ms. Gongwer's request, the three children were sent to California to stay with her in May of 2002. Mother gave written permission, by a document dated May 24, 2002, for Ms. Mustin to transport the children to California, and for Ms. Gongwer to care for the children and to seek temporary custody "until I can care for my children in a drug free environment and myself be drug free." The document stated that Father was in jail at that time. Father also testified that he was in jail for three months in May through July of 2002. He did not object to his son going to California temporarily.

During the children's visit to California, it was intended that Mother would again attempt to deal with her drug addiction. Again, Ms. Mustin and her friends tried to help Mother. The children were sent back from California in July of 2002. Ms. Gongwer had only enough money to fly them to Indiana. Ms. Mustin located Mother, and they drove together to Indiana to pick up the children. Ms. Mustin asked Father for financial help in retrieving the children, but Father stated he had no money since he had only recently gotten out of jail.

After the children returned from California, they again lived with Mother in Franklin in the house furnished by the organization. During this time, Mother would frequently take the children away for the weekend or a few days at a time. Although Ms. Mustin was in frequent contact with Mother, she did not always know where Mother and the children were during these absences. Father testified that Mother and the children would visit him (he was living with his mother at his mother's house) almost every other weekend, and this testimony was corroborated by Mother's sister. Because Ms. Mustin did not want him around, Father's brother or Mother's sister would pick up Mother and the children. Although Ms. Mustin doubted the frequency of visits testified to by Father, she acknowledged there were times she knew the children were with Father, times Mother would call from Father's house, times that she knew Father's brother had picked up Mother and the children, and other times she just did not know where Mother was with the children. Father testified that he provided food, clothes, and other items for all the children when they visited and that whenever Mother called him and said W.B. IV needed something, he would make sure the child got it.[3] He did not pay cash support to Mother because the was afraid she would spend the money on drugs.

---

[3]Sometimes his brother would take the items to Mother; sometimes the brother would take Mother shopping.

Ms. Mustin testified that during this time Mother also would sometimes leave the children with her for days at a time, without informing anybody as to her destination or plans. After one of Mother's absences with the children, around January of 2003, Ms. Mustin received a phone call from a man who was unknown to her. He told her that he was in a hotel room with the three children and that he had no food for them or any way to take care of them. Mother had left three days earlier, and the man had no idea where she was or how to reach her. Ms. Mustin went to the hotel and brought the children back to her own home. She and her husband took care of the children.[4]

Ms. Mustin was concerned about her ability to get medical care for the children in this informal arrangement. When she located Mother, she presented her with a document designed to give Ms. Mustin and her husband legal custody of the three children while Mother entered a drug rehabilitation program of between six months and one and one-half years in length.[5] The document included the following condition: "[u]pon verified successful completion of the program in full accordance with the program requirements and after demonstrating that I am able to maintain a healthy drug-free, stable family environment for at least 6 months, the Mustins will return custody of my children to me." Mother signed the document on January 10, 2003.[6] Apparently, Mother did not complete the rehabilitation program nor did she return to Franklin. It is not clear where Mother was living, although Ms. Mustin still had sporadic contact with her.

Some time later, Mother "borrowed" William Mustin's car without permission. When she did not return it after four days, the Mustins swore out a warrant against Mother, who as a result was then incarcerated in the Williamson County Jail. By that time, Ms. Mustin realized that she needed the assistance of the courts. On May 1, 2003, she filed a dependency and neglect petition in the Juvenile Court of Williamson County, which was heard the same day.[7] Mother was brought from the jail to attend the hearing on the petition. The Juvenile Court Referee appointed a Guardian ad Litem, found that the children were dependent and neglected, and placed them in the temporary legal and physical custody of Ms. Mustin.[8]

Mr. and Mrs. B got to know the children through a vacation bible school the children attended in the summer of 2003. They became interested in the children and wanted to help Ms. Mustin with them. After assuring herself of the Bs' character, Ms. Mustin agreed to let them visit

---

[4]Ms. Mustin testified that she had fourteen children living in her home. She and her husband were the parents of four of them.

[5]Ms. Mustin stated that Mother had completed and/or failed to complete programs of shorter duration, but that none had worked for her on a long term basis.

[6]We do not comment on the enforceability of such a document in these or other circumstances.

[7]Father was incarcerated at this time.

[8]Ms. Mustin testified she delivered Mother's mail to her at the time, that the mail included child support checks for D.D., and that Mother bailed herself out of jail, presumably with that money. Mother's whereabouts after that were not made clear from any testimony.

the children at her home. They visited several times a week, and then had the children visit them in their own home. The Bs had three children of their own.

On July 28, 2003, the Bs filed a petition for custody of the three children of Mother. Among other things, the petition stated that they "wish to adopt the minor children and plan to proceed with legal proceedings necessary to accomplish this adoption." They had the agreement of Ms. Mustin and Kadesh Barnea.

The Juvenile Court Referee heard the Petition for Custody on the same day it was filed. The referee noted the failure of Mother to take responsibility for the children, and the agreement of Ms. Mustin to the proposed change of custody. The referee recommended that custody be awarded to the Bs, and the recommendation was confirmed as the decree of the court on August 7. There is nothing in the record to show that either Mother or Father received written notice that the petition for change of custody had been filed or that the petition had been granted. They also received no other type of notice prior to the proceeding. Father was in prison at the time,[9] and he routinely telephoned Ms. Mustin to check on and talk to W.B. III. Ms. Mustin did not inform him of the petition to change custody or the proceedings thereon.

The children went to live with the Bs and started the school year. Even after this change, Ms. Mustin did not tell Mother or Father that the children were now in the custody of someone else. During this time period Ms. Mustin told Father when he called that she could not put W.B. IV on the phone because "you just missed him." Mother and Father at some point learned that the children were no longer with Ms. Mustin. Ms. Mustin testified that after a period with no contact from Mother, Mother called and "somehow she [Mother] found out that they were living with somebody else." Whether in this or a subsequent call, Mother became angry and cursed Ms. Mustin. She made more telephone calls, and Ms. Mustin felt harassed and stopped taking phone calls from Mother. That was the turning point in Ms. Mustin's relationship with Mother. She testified that she did not tell Mother where the children were because she wanted to spare the Bs from harassment. Mrs. B testified that she had asked Ms. Mustin not to give out the information that the Bs had custody of the children or any contact information about them.

Mother and Father found out, apparently through family members, that the children were with the Bs.[10] Mr. and Mrs. B did not meet or have any contact with Father until after he got out of prison. After Father was released on October 23, 2003, and learned how to reach W.B. IV, he called

---

[9]This incarceration was for violation of probation. Father admitted on cross-examination to numerous run-ins with the law and several misdemeanor and felony convictions. He is a recovering addict who also sold drugs in the past. He testified that as of the date of trial, he had been clean for 14 months.

[10]Mrs. B testified that she ran into one of Mother's family members while she had D.D. in tow and gave him her home phone number, "and said that we would be willing to work with them, if they would like to call and check on her." Mrs. B did not remember when this incident occurred. Father testified that a cousin who works at the Bs' church called Father's mother and told her that the Bs had had her grandson, W.B. IV, baptized, and that was how he learned of his son's whereabouts.

the Bs, wanting to see his child. That call became contentious. He had also called Ms. Mustin, and that conversation led the Bs to seek a restraining order against him.[11] The petition was resolved by agreement.

On November 3, 2003, the Bs filed three petitions in the Juvenile Court to terminate the parental rights of Mother and the fathers of each of the three children. The petitions only cited a single ground for termination: ". . . because [respondents have] abandoned the child as defined by Tennessee statutory and case law in that a period of at least four (4) months has immediately preceded the filing of this Petition during which the [Respondents have] willfully failed to pay support for the child or maintain regular contact with the child."

After the restraining order petition was dismissed, Father was allowed two supervised visits with his son at the Bs' church. He also dropped off Christmas presents for all three children at the Bs' home. In January, Father's mother became seriously ill, and he was unable to visit his son for a while. He called the Bs and asked that W.B. III be brought to visit his grandmother, and they declined. He later asked that the child attend his grandmother's funeral, and again they declined.

In January of 2004, both Mother and Father filed petitions to set visitation, since visitation had not been addressed in the custody orders. After a hearing on January 26, 2004, those petitions were continued and set to be heard with the petition for termination of parental rights. Neither Father nor Mother was allowed any visitation during this time. On March 2, 2004, Father filed a petition for custody of his son. He stated that he had been incarcerated during the hearing that led to the Bs obtaining custody and that he had not been given any notice of the proceeding. He further claimed to have a meaningful relationship with W.B. IV and insisted that he has "maintained continual care, supervision and support of the minor child since his birth and until a period of incarceration in February 2003 and ending October 23, 2003."

## II. THE TERMINATION HEARING

The hearing on the Bs' petition for termination was conducted on March 3, 2004. Both Mother and Father were present and represented by counsel. A Guardian ad Litem represented the interests of the children.

Of the nine witnesses who took the stand, Diann Mustin testified at the greatest length. Other testifying witnesses were Mrs. B, Mr. B, a CASA volunteer,[12] a child and family therapist who had

---

[11]On October 29, 2003, the Bs filed a petition for restraining order against Father, alleging that he "has threatened to physically take custody of [W.B. IV]. The petitioners fear that he will do so, and abscond with the child and/or children." Father denied making any such threats. Following a hearing before the Juvenile Referee, the petition for restraining order was dismissed by agreement with a warning.

[12]CASA volunteer Harry Boyco testified that he had visited Father's home in February 2004 and found it clean and adequate and that Mother appeared to be staying there with Father. He also visited the Bs, and stated that he thought
(continued...)

counseled one of the children, a nurse who was a friend of Mother, the younger sister of Mother, and respondent W.B. III, Father. Mother herself did not take the stand.

Diann Mustin told of longtime efforts by herself and her friends to help Mother overcome her drug addiction. Despite those efforts, and despite Mother's several attempts at rehabilitation through various programs, Mother had been unable to stay off drugs. Ms. Mustin and her friends took the steps that they felt were necessary to protect the children from their parents.

Ms. Mustin's testimony regarding Mother's history of drug use and failed attempts to overcome it was essentially uncontradicted by other witnesses. However, Ms. Smith-Keaton testified in Mother's behalf. The witness, an LPN working with Meharry Medical College, met Mother three years earlier when Mother was in a drug treatment program for pregnant women. They had remained friends. Ms. Smith-Keaton attempted to provide support for Mother in dealing with her drug addiction. She testified that Mother had recently completed a 28-day inpatient treatment program at Meharry and had since taken steps toward improving her life so that she could regain her children. For example, Mother had gotten a job. However, Ms. Smith-Keaton also testified that Mother had chosen not to participate in the program's after care component. It was the witness's belief that psychological problems underlying drug use and addiction must be addressed for a successful recovery, and she noted that no one had addressed these needs for Mother in the past.

Mother's younger sister essentially corroborated Father's involvement with W.B.IV prior to his incarceration, including the frequent weekend visits to Father's mother's house and the providing of support during those visits and otherwise providing items for the child.

The evidence also showed that Father had in the past used and sold illegal drugs. However, he had been clean for over a year. When Father took the stand, he testified that during the time that Mother was living in Franklin, he would often have her and the children come to his house for the weekend, as set out earlier. Father testified that he had a good relationship with his son and exercised visitation as often as he could. He claimed, however, that Ms. Mustin and the Bs were begrudging and severely limited his opportunities for visitation. He admitted that he did not pay support for his child, but claimed that he furnished the needs of Mother and all the children when they visited with him. He also stated that he now had a regular job at his brother's cleaning business and the he lived in and at least partly owned the house that had belonged to his late mother.

Ms. Mustin and the Bs testified that they had reservations about letting Father have visitation with his son. They did not believe that it would be in the best interest of any of the children to visit him. Ms. Mustin stated that she did not seek to cut Father off from his child. However, she testified that Father had admitted to her on at least one occasion in the past that he was unable to take care of the child, and that "I did have a problem with him seeing [Father] because I knew it was hopeless. It was a hurtful thing to me because I knew that that's all it was," meaning that it was only a visit.

---

[12](...continued)
they were "a wonderful family" and that the children appeared to be well-cared for.

-7-

At the conclusion of the hearing, the trial court announced its decision from the bench. The court declared that the petitioners had proven by clear and convincing evidence that Mother had abandoned her children and also stated that it found on its own motion that the conditions of dependency and neglect which led to the removal of the children from their mother's home still persisted and would prevent their safe return to Mother. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A). The court also found that it was in the best interest of all the children that the mother's parental rights be terminated.

The court recognized that terminating Father's parental rights presented a more difficult situation, because it was not clear that he willfully failed to visit his child. The court held, however, that the ground of abandonment had been proven because Father had willfully failed to support his son during the four months prior to the filing of the petition. The court determined that it was in W.B. IV's best interest that Father's rights be terminated because of the child's bond with his siblings.

The trial court memorialized its decision in two separate orders, both filed on April 19, 2004, one terminating the parental rights of Mother, the other terminating the rights of Father. Mother and Father both filed motions to alter or amend. After a hearing on June 3, 2004, the trial court denied both motions.[13] The parties then filed separate notices of appeal, which this court has consolidated for purposes of decision.

### III. STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, and of

> severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian. The parent or guardian shall have no further right to notice of proceedings for the adoption of that child by other persons and shall

---

[13] The petitioners argued that the Rules of Juvenile Procedure and relevant statutes required that all post-trial motions in Juvenile Court be brought by petition rather than by motion, and that the court could not therefore consider the motions to alter or amend. They contended that as a result, the respondents' notices of appeal were untimely because filed more than thirty days after the termination order. The trial court held that the motions tolled the time for the filing of the notice of appeal, but denied the motions.

have no right to object to the child's adoption or thereafter to have any relationship, legal or otherwise, with the child. . . .

Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996), quoting *Santosky,* 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.*, (quoting *Santosky*, 455 U.S., at 774, 102 S.Ct. at 1405 (Rehnquist, J., dissenting)).

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition, it must be shown that termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

One of the safeguards required by the fundamental nature of a parent's constitutional rights is that courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *In re M.W.A.*, 980 S.W.2d at 622. To justify the termination of parental rights, both the grounds for termination and the fact that termination is in the best interest of the child must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *In re C. W. W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re C. W. W.*, 37 S.W.3d at 474; *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001).

Thus, it was the burden of the parties seeking to terminate Mother's and Father's parental rights, herein the Bs, to present "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn by the evidence" that grounds exist and that termination would serve the best interests of the children. *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 n.3.)

Due to the grave consequences that accompany such decisions, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Due process requires the application of stringent standards to insure protection of the fundamental rights at stake. Because of the constitutional implications, gravity of consequences, higher standard of proof, and required individualized decision making, our legislature has explicitly required that courts making termination of parental rights decisions "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k).

In this court's review, we must determine *de novo* whether the Bs proved their case by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 546. First, we must review each of the trial court's specific findings of fact *de novo*, with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). Then, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49.

## IV. ABANDONMENT

Abandonment, as defined by statute, is one of the grounds for termination of parental rights. Tenn. Code Ann.§ 36-1-113(g). The definitions of abandonment are found in Tenn. Code Ann. § 36-1-102(1)(A), and the ones that are relevant herein include the willful failure to visit (or engage in more than token visitation) or willful failure to support the parent's minor child (or make reasonable payments toward the support of the child) for a period of four consecutive months. Tenn. Code Ann. § 36-1-102(1)(A)(i) and (iv).

The statutory requirement that the failure to visit or to support must be willful is constitutionally mandated, and intent is a necessary element of abandonment. *In re Swanson*, 2 S.W.3d at 188. Thus, if the failure to support or visit cannot be proved to be intentional or willful, then abandonment has not been shown. *In the Matter of D.L.B.*, 118 S.W.3d at 367 ("parental rights may be terminated only if . . . the failure to make reasonable payments was willful").

The concept of willfulness or intent is often the determining factor in whether the existence of that ground has been shown by clear and convincing evidence. *See, e.g., In re J.J.C., D.M.C., and S.J.B.*, 148 S.W.3d 919, 927 (Tenn. Ct. App. 2004) (holding that DCS did not show by clear and convincing evidence that the father's failure to support was willful since the permanency plans would have led him to believe that support payments were required only if a court ordered such payments and the father visited the children and provided gifts for them); *In re L.J.C., A.L.C., and*

*J.R.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003) (holding that the record did not provide clear and convincing evidence that an indigent mother intended, rather than was simply unable, to pay child support); *In re A.D.A.*, 84 S.W.3d 592, 598 (Tenn. Ct. App. 2002) (holding that the proof did not show that the mother's failure to visit was intentional rather than the result of a number of circumstances including DCS's placement of the child in another county).

The question of intent or willfulness is fact specific and depends on the totality of circumstances. Failure to provide support is willful if the parent is aware of his or her duty to support, is capable of paying support, makes not attempt to provide support, and has no justifiable excuse. *In re J.J.C., D.M.C., and S.J.B.*, 148 S.W.3d at 926, quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (no Tenn. R. App. P. 11 application filed). Willful conduct is intentional or voluntary; often, intent must be inferred from circumstantial evidence. *Id.* Willfulness is a question of fact that the trial court is in the best position to make. *In re D.L.B.*, 118 S.W.32d at 367.

### V. GROUNDS AS TO FATHER

As to Father, the petition filed by the Bs alleged that he had abandoned his child, W.B. IV, in that for a period of four months immediately preceding the filing of the petition, Father had willfully failed to pay support for the child or maintain regular contact with the child. This language tracks one of the definitions of abandonment, Tenn. Code Ann. § 36-1-102(1)(A)(i). In the order terminating Father's parental rights, the trial court found by clear and convincing evidence that Father had abandoned his child in that for a period of at least four months prior to the filing of the petition to terminate he willfully failed to pay support for the minor child. While both the Bs and the trial court relied upon the definition of abandonment that is found in subsection (i) of Tenn. Code Ann. § 36-1-102(1)(A), that reliance was misplaced because another subsection applies to Father.

Under the applicable definition, abandonment means:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either *has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration*, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). This definition recognizes that an incarcerated parent has limited opportunities to visit or to earn money with which to pay support, making it difficult to show that such failures were willful. *See In re Adoption of Copeland*, 43 S.W.3d 483, 488-489 (Tenn. Ct. App. 2000).

In the case before us, Father was incarcerated between February of 2003 and October 23, 2003. The termination petition was filed only eleven days after Father was released from prison. Thus, the definition found in Tenn. Code Ann. § 36-1-102(1)(A)(iv) was the applicable one. The relevant period of time for the determination of whether Father abandoned his son was the four months prior to February 2003. *In re C.W.W.*, 37 S.W.3d at 474 (holding that because the mother was incarcerated for a portion of the four months immediately preceding the filing of the petition, subsection (A)(iv), which had been alleged along with (A)(i), governed).

The petition alleged a ground that could not be applied to Father. It is clear from the wording of the order that the trial court terminated Father's parental rights on a ground that was simply not applicable, as a matter of law. Consequently, we must reverse the trial court's termination of Father's parental rights based on failure to support in the four months immediately preceding the filing of the petition.

The Bs argue they also proved a willful failure to support for the relevant four-month period.[14] Because the trial court used the ground based on the wrong four month period, presumably because that was the allegation in the petition, the court made no findings of fact as to whether Father willfully failed to provide reasonable support during the four months immediately preceding his incarceration.[15] That omission would require us to remand for findings on that issue if that ground were alleged in the petition.[16] *In re D.L.B.*, 118 S.W.3d at 367 (remanding for findings as to "all other grounds for termination of parental rights asserted in the . . . petition"); *In re J.J.C., D.M.C., and S.J.B.*, 148 S.W.3d at 928 (remanding for findings as to alternative ground for termination alleged in the petition).

However we have reviewed the petition and find no allegation of a ground based on willful failure to support during the four months preceding Father's incarceration. The petition specifically

[14]They base this argument on the assertion that Father never directly paid child support to Mother or to Ms. Mustin. Of course, such a failure does not in and of itself establish a willful failure to make reasonable support payments.

[15]In listing its reasons for determining that termination of Father's parental rights was in the child's best interest, the court also found that father was attempting to make a change in his circumstances, was attempting to live a healthier lifestyle and abstain from drugs, and had attempted to visit. With regard to the best interest factor at Tenn. Code Ann. § 36-1-113(i)(9), the court found, by clear and convincing evidence, that Father had willfully failed to pay support consistent with the child support guidelines, but it is not clear what period of time this statement refers to. Additionally, such failure is not a ground for termination, and, as the discussion of willfulness makes clear, does not establish the ground of willful failure to provide reasonable support.

[16]Although in *In re Valentine*, 79 S.W.3d at 546, a termination of parental rights case, the Supreme Court stated that when the trial court has not made a specific finding of fact on a particular matter, appellate courts review the facts in the record under a *de novo* standard, the Court later made clear in *In re D.L.B.* that, at least with regard to the factual question of willfulness, the trial court is in the best position to make such findings and, where such findings are absent, the case should be remanded. In a number of cases, the Court of Appeals has relied on *In re D.L.B.* as well as Tenn. Code Ann. § 36-1-113(k), to vacate and remand for the required findings. *See, e.g.*, *In re J.W.P.*, 154 S.W.3d 586, 591 (Tenn. Ct. App. 2004) (vacating termination order on grounds found by court because of lack of findings of fact and remanding for preparation of findings and conclusions).

-12-

alleges only one ground: abandonment by willful failure to support or visit for the four month period immediately preceding the filing of the petition. This pleading limited the ruling to that ground because to find otherwise would place the parent at a disadvantage in preparing a defense. *See In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004) (holding that because of the fundamental nature of parental rights, courts must take a very strict view of procedural omissions that could put a parent at a disadvantage in preparing for trial).[17]

The Bs also argue that they proved that prior to his incarceration Father engaged in conduct that exhibited a wanton disregard for the welfare of his child, referring to the last part of Tenn. Code Ann. § 36-1-102(1)(A)(iv). However, they did not come even close to alleging this ground in their petition, and Father could not be considered to have been on notice that he would have to defend against this charge. The trial court did not make any findings on this allegation and was not asked to because it was not an issue raised in the pleadings or at trial.

The order terminating Father's parental rights is reversed.

## VI. GROUNDS AS TO MOTHER

Herein, the trial court found that Mother had abandoned her children by willfully failing to support them or maintain contact with them in the four months preceding the filing of the petition.[18] The evidence is clear that Mother's attention to the needs of her children was sporadic at best and that she did not visit with them or offer them any support between July 3, 2003 and November 3, 2003, the date on which the Bs filed their termination petition.

The evidence from which willfulness or intent can be inferred, however, is less clear. Custody of the children was changed to the Bs on July 28. Thus, for over three of the relevant four months, the children were no longer with Ms. Mustin. Ms. Mustin did not tell Mother about the change in custody. After Mother found out and became hostile to Ms. Mustin in a telephone call, Ms. Mustin took no more calls from her. At the Bs' request, Ms. Mustin did not reveal the identity of the children's custodians.

The evidence is not clear when Mother learned the children were with the Bs. Father called them on behalf of himself and Mother sometime after he was released from prison. Mrs. B testified Mother did not make contact with them until around Thanksgiving, after the petition was filed.

It is difficult to understand how Mother could have visited the children while she was unaware of their whereabouts. Of course, she could have taken steps through the courts to find the

---

[17]Even though there was some testimony about the degree of Father's support during the child's life, we cannot conclude on the basis of this record that there was an implied consent to try the ground set out in Tenn. Code Ann. § 36-1-102(1)(A)(iv.). *See* Tenn. R. Civ P. 15.02

[18]The court also found by clear and convincing evidence that Mother had neglected the children "to the point that such neglect is shocking" for at least four months prior to the filing of the petition.

children and establish visitation. She did file a petition for visitation in January of 2004, but it was not heard until the hearing on the petition to terminate parental rights. The Bs did not think it would be good for the children to see their mother since her prior conduct of leaving them caused them anxiety.

There is little evidence of Mother's situation before Father was released.[19] At the time of the hearing and for some time before, she lived with him at his house. She had entered and completed a drug treatment program shortly before the hearing, outside the relevant four month period.

With regard to support, the evidence of Mother's ability to pay support is sketchy. There was testimony she regularly received child support for D.D. from D.D.'s father and did not send any of that money to Ms. Mustin or the Bs during the relevant four month period. There is no evidence that Mother had any other source of income during that time. Further, the Bs' attorney stated the Bs did not request and would not have accepted any support; Ms. Mustin never asked Mother to provide support.

When the Department of Children's Services or other child-placing agency obtains custody of children removed from the parents' home, it is required to notify the parents of the statutory definitions of abandonment and the criteria and procedures for termination of parental rights. Tenn. Code Ann. § 37-2-403(a)(2)(A). In such situations, a court cannot terminate a parent's rights on the ground of abandonment unless such notice, including the consequence of abandonment, has been given by the agency petitioning for termination or the court itself. Tenn. Code Ann. § 37-2-403(a)(2)(B). In the case before us, neither DCS nor another agency was involved, so the statute does not apply. Nonetheless, Mother's knowledge of a duty or expectation that she provide support and visit is a factor in determining willfulness. We find nothing in the record to indicate she was ever told she was expected to provide support or face termination of her parental rights.

Mother appeared at the hearing on May 1, 2003, on Ms. Mustin's petition for custody, having been brought from jail that day. The result was an agreement by Mother that the children were dependent and neglected and an agreement that Ms. Mustin should be given temporary custody. Mother also agreed to attend and successfully complete a long-term, inpatient drug and alcohol treatment program. Ms. Mustin testified that long term meant an extended program of twelve to twenty-four months. The temporary arrangement was to remain in effect until changed by further agreement, and the final hearing on the petition was stayed "upon [Mother] complying with the orders of this court." Ms. Mustin testified that at the May 1 hearing Mother was informed that the next court date was in July.[20] As of the July hearing on the Bs' petition for custody, Ms. Mustin had

---

[19]At some point prior to the filing of the petition, Ms. Mustin drove Mrs. B to the Napier Homes area. They saw Mother on a street corner there with a group of people. Ms. Mustin testified Mother was making suggestive body movements. Neither woman approached Mother or attempted to talk to her.

[20]Although Ms. Mustin did not state that July 28 was the exact date given, that is the implication. It was the hearing on that date that resulted in the change of custody to the Bs. The Bs make much of Mother's failure to appear

(continued...)

not heard from Mother since the May 1 hearing. The next time Mother contacted her was after Mother found out the children were living elsewhere.

The Bs filed their petition for custody July 28, 2003, and in it asked that process issue and that Mother be served and be required to answer. The petition included a notice, however, that a hearing was to be held on July 28 at 9:00 a.m., the same day it was filed. A hearing was indeed held that day, without Mother or Father, and an order was entered August 7 awarding custody to the Bs.[21]

Nothing in the record indicates Mother was informed by anyone that her failure to visit or support the children for four consecutive months could result in termination of her parental rights.[22]

Although a parent has a continuing responsibility to support his or her children. *In re L.J.C.* 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), a termination of parental rights based on abandonment for failure to support must include a determination that the failure was willful. In other cases, DCS's lack of clarity in notifying parents of the elements and consequences of abandonment has been found to detract from proof of willfulness. *See, e.g.*, *In re J.J.C., D.M.C., and S.J.B*, 148 S.W.3d at 927; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *13 (Tenn. Ct. App. Aug. 13, 2003).

We find that the evidence did not rise to the level of clear and convincing that Mother willfully failed to support or visit her children during the four months immediately preceding the filing of the petition.

In addition to abandonment, the trial court, on its own motion, found "by clear and convincing evidence that conditions leading to the children's removal from [Mother] for neglect still persist and therefore prevent a safe return to the home of [Mother] for the children ..." The court's order echoes the statutory language describing an additional ground upon which a termination of parental rights can be based, commonly called persistence of conditions. Tenn. Code Ann. § 36-1-113(g)(3)(A).

The Bs' petition alleged abandonment as its only ground as to Mother; it made no mention of persistence of conditions or facts relevant to that ground. On appeal, Mother argues that it was a violation of her due process rights to base the termination of her parental rights on a ground that

---

[20](...continued)
at that hearing, but the record does not show that Mother was ever served with or notified of the petition to give custody to the Bs.

[21]The order stated the children were found to be dependent and neglected due to abandonment by their mother, "due to the Court's assumption of [Mother's] continued drug use, and due to [Mother's] failure to comply with this Court's prior Order in this matter." The evidentiary basis for these findings does not appear in this record.

[22]The requirement that she enter and complete a long term inpatient treatment program would seem to present difficulties with regular visitation or support.

was not raised in any of the pleadings. The Bs do not argue that the court's termination of Mother's parental rights on the persistence of conditions ground was appropriate. Instead, they assert that the trial court based its decision on the ground alleged in the petition, *i.e.*, abandonment, and on the evidence presented.[23]

We agree with Mother's argument and the Bs' decision not to contest that argument. Generally, a court may only try issues that have been raised in the pleadings. A major purpose of pleadings is "to give notice of the issues to be tried so that the opposing party can adequately prepare for trial." *Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002). Proper notice is considered a fundamental component of due process. *Mullane v. Central Hanover Bank & Trust* Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657 (1950); *State v. Pearson,* 858 S.W.2d 879, 884 (Tenn. 1993). While it is true that parties may try an issue not raised in the pleadings by express or implied consent, *see* Tenn. R. Civ. P. 15.02,[24] we cannot conclude that the parties tried a totally separate ground in this case. There is nothing in the record to indicate that the parties had any reason to believe that the court was considering another ground.

Because the private interest at stake in this case is fundamental, *i.e.*, the permanent severing of all parent-child ties; because the risk of an erroneous deprivation of those rights is created by a *sua sponte* ruling on a ground not alleged is great; and because the government has no compelling interest in such a procedure, due process compels reversal of the trial court's holding that Mother's parental rights could be termination on the basis of Tenn. Code Ann. § 36-1-113(g)(3)(A). *See Keisling*, 92 S.W.3d at 378-80. Mother was at a distinct disadvantage in preparing to defend on a ground that was not alleged, and the courts are required to view due process requirements strictly

---

[23]The brief states that minimum requirements of due process were provided Mother because she was given written notice of the claims and the evidence against her in the petition, given the opportunity to be heard, was afforded trial rights, had a neutral judge, and was given an order reciting the facts relied on by the court. It is on the basis of the assertion that Mother was given written notice of the claims and evidence against her that we interpret the Bs' position, since the only ground alleged was abandonment in the four months preceding the filing of the petition. Consequently, although the Bs' statement that, "The Trial Court's elaboration on the facts of the case does not negate its holding clearly based upon the proof presented" could be read another way, we interpret it, and the rest of the argument, to essentially state that even if the court was in error in relying on a ground not alleged in the petition, such error was harmless in view of the finding based on the alleged ground. Additionally, the Bs do not argue there was clear and convincing evidence to support the persistence of conditions ground.

[24]In *Gonzales v. Department of Children's Services*, 136 S.W.3d 613, 617 (Tenn. 2004), our Supreme Court held that the question of intervention in a termination of parental rights case heard in juvenile court should be analyzed under Rule 24 of the Tennessee Rules of Civil Procedure because those rules apply in chancery and circuit courts and those courts have concurrent jurisdiction with juvenile courts to hear termination of parental rights cases, because the Rules of Juvenile Procedure do not address intervention, and because the application of the rule would not compromise the efficacy of juvenile proceedings. We think a similar analysis would result in the application of Tenn. R. Civ. P. 15 to termination proceedings in juvenile courts. The Rules of Juvenile Procedure do not directly address the issue of amendment of pleadings to conform to the evidence or express or implied consent to try issues not set out in the pleadings. Rule 39 of those rules, governing termination of parental rights cases, however, states that the court shall conduct a hearing "to determine the issues raised by the petition and by any answer(s) filed." Tenn. R. Juv. P. 39 (f)(1). This rule does not conflict with the procedure authorized by Tenn. R. Civ. P. 15.02, which should be strictly construed in a proceeding to deprive a parent of his or her constitutionally-protected rights.

in cases involving the termination of parental rights. *See In re M.J.B.*, 140 S.W.3d at 651. Accordingly, we reverse the trial court's holding on the ground of persistence of conditions.

## IV. CONCLUSION

Much of the testimony at trial and much of the trial court's ruling had to do with the children's best interests, *i.e.*, the second prong of the two-part requirement for termination of parental rights. It would be improper for us to determine whether there was clear and convincing evidence that such interests lay in termination of Mother's and Father's parental rights because of our conclusions that no ground for termination was shown by the constitutionally and statutorily-mandated standard. *In re D.L.B.*, 118 S.W.3d at 368 ("Because grounds for terminating the parental rights of [the father] have not been established, we do not reach the best interest of the child analysis."); *In re J.W.P.*, 154 S.W.3d at 593 (holding that it would be premature to address the issue of best interests under Tenn. Code Ann. § 36-1-113(b) absent the establishment of grounds under subsection (a) of that statute).

Courts are not authorized to terminate a parent's rights only because the children would be better off with such termination. There must first be a showing that a parent has in essence forfeited his or her rights through conduct the legislature has determined constitutes sufficient danger of harm to the child to be made a ground for termination. "The federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d at 188.

Thus, despite the good intentions of the Bs to provide a stable and nurturing environment for these children by adopting them, our decision cannot be based on the benefits to the children from such an outcome without proof of grounds. We must also base our decision solely on the grounds actually plead and the proof presented at trial and properly admitted into evidence.

However, our reversal of the termination order does not affect the order currently in place giving the Bs custody of the children. *In re Valentine*, 79 S.W.3d at 550. Questions regarding future custody or visitation arrangements remain within the purview of the juvenile court. *Id*.

The order of the trial court terminating Mother's parental rights is reversed. The order terminating Father's parental rights is also reversed. The costs on appeal are taxed to the appellees.

_____
PATRICIA J. COTTRELL, JUDGE